1432

Betty S. BIXBY, Employee, Respondent v. CITY OF CHARLESTON,
Employer, Appellant.

(388 S. E. (2d) 258)

Court of Appeals

*William B. Regan* and *Frances I. Cantwell*, Charleston, *for appellant.*

*Francis X. McCann*, Charleston, *for respondent.*

Heard Nov. 6, 1989.

Decided Dec. 11, 1989.

GARDNER, Judge:

In this workers' compensation case, Betty S. Bixby (Bixby), the claimant, suffered a compensable injury to her nose. The Hearing Commissioner ruled that Regulation 67-35 was inapplicable and awarded Bixby 20 percent permanent-partial disability to the whole man. The Full Commission and Circuit Court affirmed. We reverse and remand.

## ISSUE
The only issue of merit is whether the trial judge erred in holding that Regulation 67-35 was not applicable to this case.

## FACTS
Bixby, at the time of the hearing, was a 33 year old policewoman employed by the City of Charleston, South Carolina. While working she suffered a severe blow to her nose. There is evidence of record that she smokes one and a half packs of cigarettes per day.

Bixby was injured on September 6, 1981, while making an arrest. She suffered a floating fracture of the left nasal bone and a deviation of the nasal septum with a fracture of the bony and cartilaginous nasal septum and septal hematoma. She was hospitalized and underwent surgery consisting of an open reduction of the nasal fracture with nasoseptal reconstruction. Dr. John E. Gibbs, Jr., (Dr. Gibbs), was the surgeon. Bixby's sister worked for Dr. Gibbs as his allergy nurse.

After surgery, Dr. Gibbs continued to treat Bixby for allergic sinusitis symptoms, upper respiratory infections and headaches. Bixby underwent surgery again in 1984 because of some deflection, slippage and absorbing of a portion of the dorsal nasal bone which was fractured at the time of the accident and had apparently lost its blood supply. The first and second operations resulted in a decrease in the external size of her nose and a decrease in the internal aperture of each nostril.

In his deposition, Dr. Gibbs testified that Bixby has increased frequency of upper respiratory infection, sinusitis, occasionally severe headaches and increased allergic symptoms which require medication. Dr. Gibbs' testimony is that the injury created a situation where any swelling creates increased blockage. In discussing Bixby's allergy problems, Dr. Gibbs testified the injury resulted in a smaller nose which, as a result, had less room to respond to a mininal allergic problem and therefore became a major allergic problem. It is Dr. Gibbs' opinion that the injury did not cause the allergies. We quote the following pertinent testimony:

Q. You're saying that she had minimal problems beforehand?

A. I think she had basic inhalant allergy beforehand. But considering the fact that her sister was my allergy nurse, her problems had to be minimal prior to the accident. And what I'm trying to say is if you were to draw—for instance, if you look at my finger here, Billy, like this. (Indicating.)

If you have that big a hole to breathe through, an allergy—and you get exposed to so much allergy, it will cause so much swelling, the response to the nose being the target organ is swelling. It will swell like that, but it will still be open enough to breathe through. Therefore, if it's decreased, **then it will swell shut.** And that's what's been happening with this girl.

And her chief complaint has been **nasal obstruction.** Her secondary complaint has been **headaches,** and the third thing has been an ongoing recurrent **sinusitis** ever since the accident.

Later Dr. Gibbs summarized his testimony as follows:

> I think that the injury—that the injury resulted in a smaller nose which, as a result, had less room to respond to a minimal allergic problem and therefore became a major allergic problem because what was formerly a minor problem became major **in that the smaller nose closed off and made her complaint [sic] of nasal obstruction.** And it also provoked sinusitis, and it also provoked headache.

Stated differently, Dr. Gibbs' testimony, when carefully analyzed, reflects that Bixby suffered occasionally from a stopped up nose and sinus headache.[1] Both Dr. Gibbs and Bixby testified that these symptoms are relieved when she takes the medicine prescribed by Dr. Gibbs.

We have carefully searched the record and find no medical testimony to the effect that Bixby suffers from increased upper lung infection. Dr. Gibbs testified that she suffered from increased upper respiratory infection. The term "upper respiratory infection" is an imprecise one for almost any kind of infectious disease process involving the nasal passages, pharynx and bronchi. The etiological agent may be bacterial or viral and is rarely accurately known. *Taber's Cyclopedic Medical Dictionary* 1942 (16th Ed. 1989). Dr. Gibbs does not refer to the upper lungs and indeed his testimony is devoid of any reference to infection either in the pharynx or any of the bronchi. There is no medical evidence of record referring to infection of the pharynx or any of the bronchi, let alone the upper lung, which, as we understand it, would not be included in the definition of an upper respiratory infection.

In addition to treatment by Dr. Gibbs, Bixby was seen by Dr. George Walker Bates, Jr. (Dr. Bates). Dr. Bates first examined Bixby on June 19, 1984. Dr. Bates indicated Bixby's nasal problems were aggravated by (1) an infection in the nasal lining, (2) chronic congestion from smoking, (3)

---

[1] The term sinus headache is used intentionally because the medical evidence of record indicates Bixby's headaches are symptomatic of her allergy problems. Consequently, effective treatment of her allergy problems necessarily relieves her headaches.

residual septal deformity, (4) hypertrophy of the inferior turbinate on the right side and (5) failure of the nasal membranes to react normally to topical vasoconstrictors implying rhinitus medicamentosa, which is a medical term for overuse of vasoconstrictor type drops. Dr. Bates suggested a "conservative treatment" plan including a cessation from smoking and excluding, in his opinion, additional surgery. In fact, Dr. Bates indicated additional surgery might further complicate her problems. In September of 1984, as noted above, Bixby elected to have the second operation. On August 21, 1986, Dr. Bates again saw Bixby. During this examination, Dr. Bates noticed (1) mild, external nasal deformity with slight deviation of the nasal dorsum to the right and a very slight angulation of the nasal dorsum with the nasal tip in the supratip area. He indicated there was no marked deformity in the nasal dorsum, and intranasally the septum is not obstructive and relatively straight.

In essence, Dr. Bates indicated a decrease in the nasal cavity would not necessarily result in an increase in upper respiratory problems or in sinus problems.

There is of record a report from Dr. O. Rhett Talbert, a neurologist. Dr. Talbert examined Bixby in September 1986. Dr. Talbert found no evidence of an intracranial tumor or disease and no other neurological explanation for the headaches which Bixby complained of. Bixby gave to Dr. Talbert the following medical history.

> She has been bothered with headaches since she fractured her nose in 1981. The history of this is detailed in the records from Dr. Bates. He has furnished me copies of her past records pertaining to her chronic ENT problem. She states the headaches occur whenever the weather changes from cool to warm or when the humidity is high. For example, her last one was yesterday at 2 p.m., a couple of hours prior to a rain storm. They occur on an average of about twice a month, usually beginning during the day as a dull throbbing across the bridge of her nose and over the eyes in a mask distribution. Her eyelids get puffy. Pressure on the eyes tend [sic] to ease the pain. **Her nose gets stopped up, but she has no other associated symptoms. Dr. Gibbs has prescribed Fiorinal, which usually relieves it, along with a decongestant.** [Emphasis ours.]

The Hearing Commissioner awarded Bixby 20 percent disability to the whole man as permanent partial disability. The order is unclear whether this award was made under Section 42-9-20 or Section 42-9-30. The order simply states that, "under Section 42-9-20 and Section 42-9-30, partial disability is defined."

The report of the Hearing Commissioner was affirmed by the Full Commission. The order of the Full Commission is not of record.

On appeal to the Circuit Court, the Circuit Court held that "[C]laimant's injuries extended beyond the nasal passage and included the loss of a portion of the nasal bone, injury to the septum, headaches, allergic reactions and increased susceptibility to upper lung infections." The appealed order further held:

> Commissioner Kimpson found that the employee's injury was manifested and existed beyond the nasal passage. Further, he found that an appropriate evaluation of impairment necessitated an evaluation using a "whole man analysis." The finding of the Commissioner was mandated by Section 42-9-30(20), which applies to members, organs, and bodily parts not otherwise enumerated in Section 42-9-30 and not otherwise covered by Sections 42-9-10 and 42-9-20. Since no applicable regulations had been formulated by the Commission prescribing "a ratio which the partial loss or loss or partial loss of use of (all the bodily parts claimant had injured) bears to the whole man, basing such ratios on accepted medical standards . . ." [Section 42-9-30(20), second sentence], the Commissioner based the ratio on the accepted medical standards and evidence presented at the hearing and arrived at a "whole man" impairment rating of twenty percent (20%).
>
> Section 42-9-30(20) and its applicable regulations apply to situations not otherwise covered under Section 42-9-30. This section contains its own formulae for computing the benefit to be awarded. The limitation in Section 42-9-20 regarding proof of loss of earnings has no application to the facts herein and the "whole man" analysis employed by the Commissioner in making his award under Section 42-9-30(20) was correct.

The appealed order also held:

> As found by Commissioner Kimpson in his final order, regulation #67-35 (Loss of Organs, Members, Bodily Parts) as to "nasal passage" is not applicable.

## DISCUSSION

This court on review may reverse or modify a decision if substantial rights of the appellant have been prejudiced because administrative findings, inferences, conclusions or decisions are clearly erroneous in view of the reliable, probative and substantial evidence on the whole record or affected by error of law. Section 1-23-380(g), Code of Laws of South Carolina (1976); *Lark v. Bi-Lo, Inc.*, 276 S. C. 130, 276 S. E. (2d) 304 (1981).

A discussion of the question presented involves two queries, which are whether (1) there is substantial evidence of record to support the proposition that there is a 20 percent disability of the whole body as opposed to a partial loss of the nasal passages and sinuses and the ratio of these specific losses to the whole body, and (2) whether Workers' Compensation Commission regulation 67-35 is inapplicable to the case at hand.

### A.

We first hold that the reliable, probative and substantial evidence of the whole record negates the finding of the appealed order that Bixby's injury resulted in increased infection of the upper lung. We find no evidence of record supporting the holding that there was an increase of infection in the upper lungs. We also hold that the testimony of Dr. Gibbs relating to the upper respiratory system was limited to the sinuses and the nasal passages and included no other part of the body. Although the term upper respiratory infection is an imprecise one, we find no evidence of record in which Dr. Gibbs referred to either the pharynx or bronchi. His testimony throughout is confined to increased infections of the nose and sinuses. In his testimony he did not mention the throat, the pharynx, the bronchi or the lungs.

We therefore hold that there is no substantial evidence of record to support a holding that the injury precipitated an increase of infection in any part of the body other than the nasal passages and sinuses.

The trial judge held "[C]laimant has shown that she is entitled 'to obtain compensation in addition to that scheduled for the injured member' by demonstrating that other parts of her body were affected." He further held "claimant's injuries clearly extend well beyond the nasal passage and include the loss of a portion of the nasal bone, injury to the septum, headaches, allergic reactions, and increased susceptibility to upper lung infections."

We have already dealt with the alleged lung infections and held that there is no evidence of record to support this. The septum or nasal septum is the partition that divides the nasal (nose) cavity into two passages. It is made up of bone and cartilage. *Taber's Cyclopedic Medical Dictionary* 1662 (16th Ed. 1989). Suffice it to say that there is no evidence of record to support the proposition that Bixby suffers a residual disability as a result of bone or cartilage injury of the nasal area other than the reduction in the size of the nasal passages and the consequential effect to the sinuses.

For the above reasons, we hold that the appealed order's ruling that Bixby's compensable injuries after payment of temporary total disability extended beyond the nasal passages and sinuses is erroneous. And we so hold.

Next, we address the holding of the trial judge in which he held that Regulation 67-35 was not applicable to this case but at the same time awarded a 20 percent partial permanent disability to the whole man. In this connection, we hold that the appealed order failed to distinguish between permanent partial disability of the whole man and the ratio which the partial loss or partial loss of use of a specific member, organ or body part bears to the whole man.

Section 42-9-20 refers to a situation of partial incapacity for work. This section is the section under which a partial disability of the whole body is generally awarded. As the trial court held, however, this section is inapplicable to the case at hand because Bixby has no diminution of earning capacity.

The whole philosophy of the Workers' Compensation Act is to compensate for, or relieve from, the loss or impairment of an employee's capacity to earn, or from the deprivation of support from his earnings, and not to indemnify for physical ailment or impairment as such, except in the class of cases specifically provided for in other sections of the Code. *Jewell v. R. B. Pond Co.*, 198 S. C. 86, 15 S. E. (2d) 684 (1941).

For the reasons given, we affirm the appealed order's holding that Bixby's injury was not covered by Sections 42-9-10 and 42-9-20, but rather by Section 42-9-30(20).

Section 42-9-30 provides in pertinent part:

**Section 42-9-30. Amount of compensation and period of disability for certain injuries.**

In cases included in the following schedule, the disability in each case shall be deemed to continue for the period specified and the compensation so paid for such injury shall be as specified therein, to wit:

\* \* \* \* \* \*

(20) For the total or partial loss of, or loss of use of, a member, organ or part of the body not covered herein and not covered under Sections 42-9-10 or 42-9-20, sixty-six and two thirds of the average weekly wages not to exceed five hundred weeks. The Commission shall by regulations prescribe the ratio which the partial loss or loss or partial loss of use of a particular member, organ or body part bears to the whole man, basing such ratios on accepted medical standards and such ratios shall determine the benefits payable under this subsection.

The legislature intended to make certain the compensation to be paid to a workman who sustains any one of a number of scheduled injuries set forth in Section 42-9-30. In such cases, the compensation depends upon the character of the injury rather than the loss of earnings. *Dunmore v. Brooks Veneer Co.*, 248 S. C. 326, 149 S. E. (2d) 766 (1966).

The trial court held that under Section 42-9-30(20) Bixby was entitled to a 20 percent partial disability of the whole man but that Regulation 67-35 does not

apply to Bixby's situation. We hold this to have been error. In effect the trial judge held that Section 42-9-30(20) can be interpreted so as to permit the award of partial permanent disability (1) in those cases for which no regulation has been promulgated prescribing the ratio which a partial loss or the loss of use of a special member, organ or body part bears to the whole man and (2) in situations where no specific member, organ or body part is identified as having been partially lost or the use thereof partially lost and testimony taken to establish the ratio of the loss to the whole man in accordance with Section 42-9-30(20). While this analysis may well be plausible, the trial court neglects an important element. The ratios used must be based on acceptable medical standards. Stated differently, in instances where an injury affects an organ, member or body part not enumerated in Regulation 67-35, the claimant may recover if the ratio which the partial loss or loss or partial loss of use bears to the whole man is based on acceptable medical standards and guidelines.[2] In the case at bar, this analysis is irrelevant inasmuch as we hold Bixby's injured body part(s) is(are) specifically enumerated in Regulation 67-35.

Dr. Gibbs, in his deposition, testified that he had a great deal of difficulty coming up with the percentage of disability of the whole man, based on the injuries received by the claimant. "I've had to search my soul and come up with an approximation of 30 percent and—just on the basis of the history and the facts as they are to me. And that figure is on my part what you'd have to call an educated guess because I have no guidelines to go by."

This estimate is unacceptable in that it is not in accordance with the American Medical Association's "Guides to the Evaluation of Permanent Impairment" and is not consistent with the other relevant medical authority of record. And we so hold. We accordingly hold that the appealed order is erroneous with respect to all injuries except those injuries to the nasal passages and sinuses. And we so hold. While we realize that the injuries to these special members might very well be found upon remand to the Commission to be

---

[2] *See* Workers' Compensation Commission Regulation 67-35(II).

most severe, this is a matter for the Commission on the remand and not one for this Court to determine.

### B.

We hold that the trial judge erred in ruling that Regulation 67-35 is inapplicable to this case. The Workers' Compensation Commission issued Regulation 67-35 which provides in pertinent part the following:

**67-35. Loss of Organs, Members, Bodily Parts.**

I. This rule is issued in compliance with Section 42-9-30, sub-section 20, and is based upon:

(A) The American Medical Association's "Guides To The Evaluation of Permanent Impairment," Copyright 1971, published by The American Medical Association; and

(B) The opinion of the Workmen's Compensation Advisory Medical Committee of the South Carolina Medical Society; and

(C) Intent of the South Carolina General Assembly that compensation shall be payable for loss of any organ, member, or bodily part, or for any permanent partial loss of, or loss of use of, a member, organ, or part of the body when compensation is not otherwise payable therefor as disability or as serious disfigurement; and

(D) The legislative criterion of 500 weeks maximum period that such compensation payments are payable for the greatest loss or losses of such member, organ, or bodily part.

II. This rule is not concerned with, nor does it refer to, the many bodily systems, organs, members, and anatomical parts for which compensation is payable as disability or as serious disfigurement. This schedule of organs, members, and bodily parts are prominent parts of the anatomy subject to occupational injury and is not complete of all such bodily organs, members, and bodily parts; and the value of any organ, member, or bodily parts not included in this schedule will be determined in accordance with The American Medical Association's "Guides To The Evaluation of Permanent Impairment" and any other relevant medical authority.

III. Compensation shall be paid for the loss of organs, members and bodily parts as follows:

\* \* \*

(B) PARTIAL LOSS OF OR PARTIAL WEEKS
 LOSS OF USE

\* \* \*

47. Nasal Passage 10-75

\* \* \*

Regulation 67-35(47) lists the nasal passage as warranting compensation ranging between 10 and 75 weeks. Section R67-35(49) lists the sinus with a compensation range of between 5 and 30 weeks. Accordingly, we remand this case to the Commission for purposes of establishing the number of weeks of compensation for the described injury to the nasal passage and sinus.

## CONCLUSION
For the reasons given, the appealed order is reversed and the cause is remanded to the Workers' Compensation Commission for proceedings in accordance with this decision.

Reversed and remanded.

SANDERS, C. J., and GOOLSBY, J., concur.